## LIVINGSTON & GILCHRIST

*v.*

## THE MARYLAND INSURANCE COMPANY

1813.

Feb.    9th.

---

*Absent....*LIVINGSTON, *J. and* TODD, *J.*

To constitute a representation, (in making

ERROR to the Circuit Court for the district of Maryland, in an action of covenant upon a policy of insu

rance (against capture only) upon the cargo of the ship *Herkimer*, " from *Guayaquil*, or her last port of departure in South America, to New-York," "*warranted American property, proof of which to be required in the United States only*," " and *warranted free from seizure for illicit trade.*" The declaration was on a loss by capture.

LIVINGSTON & GILCHRIST v. MARY'D. INS. CO.

The case was stated as follows by MARSHALL, *Chief Justice*, in delivering the opinion of the Court:

Julian Hernandez Baruso, a Spanish subject, having obtained from the crown of Spain a license to import from Boston into the Spanish provinces of Peru and Buenos Ayres, in South America, in foreign vessels, a certain quantity of goods in the license mentioned, and to take back the proceeds in produce on payment of half duties, came to New York, in September, 1803, (Spain being then at peace with Great Britain,) for the purpose of carrying on trade under his said license.

On the 24th of August, 1804, he entered into a contract with a certain Anthony Carroll, for the transportation of a certain quantity of goods to Lima, in Peru, under the said license. Carroll died without carrying the contract into full effect.

On the 25th of January, 1805, war having then broke out between Great Britain and Spain, B. Livingston, who had been bound as Carroll's surety for the performance of the contract, entered into a new contract with Baruso for the transportation of the same goods.

The preamble recites the license, and says, The said Baruso has agreed with the said B. Livingston to make an adventure to Lima, on the conditions and stipulations following, to wit:

1. In consideration, &c. he agrees to the following *partnership* with the said B. L. in virtue of which he transfers to the said *firm*, all his powers, &c. (under the license) of sending an American vessel belonging to the said L. or chartered, in which vessel shall be embarked goods to the amount of 50,000 dollars, the funds and vessel to be furnished and advanced by said L.

ing insurance) there should be an affirmation or denial of some fact; or an allegation which would plainly lead the mind to the same conclusion. If by the usage of the trade insured, it be necessary that certain papers should be on board, the concealment of those papers cannot affect the Plaintiff's right to recover upon the policy. In general, concealment of papers amounts to a breach of warranty. A Spanish subject who came to the United States in a time of peace between Spain and Great Britain, to carry on a trade between this country and the Spanish provinces under a royal Spanish license, and who continues to reside here and carry on that trade, after the break

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.

2. Baruso to obtain the necessary papers from the Spanish consul, and B. L. to pay the duties. Baruso answerable for detention or confiscation by the Spanish government or vessels on account of any defect of right to send under said license, &c.

3. L. agrees in four months to embark the goods on board a vessel to Lima, to proceed thither, and to return to the United States with a cargo.

4. L. to choose the supercargo and instruct him ; and as the adventure will appear on the face of the papers to belong to B. he· shall give the supercargo a power, and recognize him the master of the cargo, so that the consignees at Lima shall follow literally his orders. The consignees, who were partners of B., to receive a commission.

6. The said L. and B. agree to divide equally, and part and part alike, the profits of the adventure. L. to have commissions on sale.

7. Optional in L. to sell in United States, or convey the return cargo to Europe. If he sells in the United States, B. may take out, at the price of sales, as much as will be equal to his rights.

8. If L. sends the cargo to Europe, he is to choose the supercargo, but the consignees to be chosen jointly.

9. In case of loss B. to claim nothing, as his share in the profits only accrues on the safe return of the vessel to the United States. Optional with L. to insure or not. L. not to be allowed for risk, if no insurance, more than 15 per cent. No insurance to be on the risks of the Spanish government.

12. If any loss accrues from causes not stipulated, B. to lose only his privilege. If loss on sale of return cargo, B. to sustain half.

Livingston soon afterwards chartered the ship Herkimer for the voyage, and entered into a contract with the other Plaintiff Gilchrist, one James Baxter, and Edward Griswold, for jointly carrying on, with them,

*[margin side-note:]*
ing out of war between Great Britain and Spain, is to be considered as an American merchant, although the trade could be lawfully carried on by a Spanish subject only. If the letter submitted to the underwriters, ordering the insurance, refer to another letter previously said before them, which letter contained information that the vessel had permission to trade to the Spanish colonies, the underwriters are bound to notice that fact, and to know that the vessel would take all the papers necessary to make the voyage legal. The usage of trade may be proved by parol, although such usage originated in a law or edict of the government of the country. The question whether the

the said voyage.  The cargo was purchased with their joint funds, and was shipped to Lima, where, and at Guayaquil, a return cargo was received, purchased with the proceeds of the original cargo.

On the 25th of March, 1806, Mr. Gilchrist addressed to Alexander Webster & Co. at Baltimore, a letter containing an order for insurance on the cargo of the ship Herkimer, from Guayaquil, or her last port of departure in South America, to New York, against loss by capture only, warranted American property, and free from all loss on account of seizure for illicit or prohibited trade.  It says, " the owners are already insured against the dangers of the seas and all other " risks, except that of capture." " You have already " had a description of the ship from Messrs. Church " and Demmill, the agent of Mr. Jackson, and which " I presume is correct." " I think proper to mention " that the insurance will be on account of Mr. Brock- " holst Livingston and myself.  Mr. Baxter and Mr. " Griswold are also concerned, but the first gentleman " thinks there is so little danger of capture, that in his " letter from Lima he expressly directs no insurance to " be made for him against this risk, and Mr. Griswold " is not here to consult.  Both these gentlemen, as well " as those for whom you are desired to make insurance, " are native Americans."

The letter of Church and Demmill was dated 13th Feb. 1806, and after describing the ship, adds, " she " sailed from Boston the 12th of May last for Lima, " with liberty to go to one other port in South America, " not west of Guayaquil, and from thence to New York. " *She has permission to trade there.*"

This letter was laid before the board of directors, and the application at that time rejected.

The letter from Gilchrist to Webster and Co. was afterwards laid before the board, and the company made the insurance for the Plaintiffs at 10 per cent.

The Herkimer, on her return voyage, was captured near the port of New York, by the *Leander*, a British ship of war, and sent to Halifax, where she was condemned.

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.

abandonment were made in due time, is not a question of fact to be exclusively left to the jury, but to be decided by them under the direction of the Court. No acts, justifiable by the usage of the trade, & done by the Plaintiffs to avoid confiscation under the laws of Spain, can avoid the policy. If the Plaintiffs do any act. which increases the risk of capture and detention according to the common practice of the belligerent, it may avoid the policy.  It is not necessary that the risk thus increased, should be the risk of rightful capture according to the law of nations.

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.

The Plaintiffs gave the underwriters notice of the capture, and obtained their permission to prosecute a claim for restoration without prejudice to their right to abandon. On receiving notice of the condemnation, they wrote a letter of abandonment, which was delivered to the underwriters, who refused to pay for the loss, whereupon this suit was brought.

On the return voyage, just after doubling Cape Horn, Baxter, who was supercargo and part owner, gave to Edward Giles, the third mate, a bundle of papers, partly in Spanish, telling him at the same time that in all probability they might fall in with privateers, who might overhaul the trunk in the cabin, and if they found the papers, it was probable the vessel might be detained as the papers were in Spanish, and they might not be able to translate them. Giles put the papers in his trunk.

After the capture, Giles was taken out of the Herkimer into the Leander, and on being asked if he had any objection to have his trunk searched, replied that he had not. The trunk was then searched, and this bundle discovered. It contained papers, covering the cargo as the property of Baruso, mixed with others which showed that in fact it was the property of the Plaintiffs and of Baxter and Griswold. Evidence was given to prove, that the usage of the trade made these papers necessary. There was also an estimate of the probable value of the cargo, if shipped to Europe.

The Herkimer arrived before the Leander ; and Baxter, upon his examination on the standing interrogatories, described truly the character of the voyage, and stated correctly the property in the cargo, but denied his knowledge of any papers, other than those which were exhibited, as belonging to the ship.

Issue was joined on the plea, that the Defendants had not broken their covenant, and the jury found a verdict in their favor.

On the trial, 28 bills of exception were taken, partly by the Plaintiffs, and partly by the Defendants. Only those taken by the Plaintiffs are now before the Court.

The Plaintiffs prayed the Court below to instruct the jury, that the letter, ordering the insurance, does not contain a representation that no person, other than the said Livingston, Gilchrist, Griswold & Baxter, was interested in the return cargo of the Herkimer; nor that all the persons interested therein were native Americans. The judges were divided on this point, and the instruction was not given.

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.

The 5th bill of exceptions stated, that the Plaintiffs prayed the Court to instruct the jury, that if they believed the testimony offered by them, then there was no such concealment of the said papers as can affect the right of the Plaintiffs to recover in this action, which instruction the Court refused to give, but directed the jury that if they should be of opinion, that from the usage and course of trade it was necessary to have the Spanish and other papers delivered by Baxter to Giles, the 3d mate, as aforesaid, then the delivery by Baxter to Giles, and the finding and taking of the said papers by the officers of the Leander, was not such a concealment as affects the right of the Plaintiffs to recover.

The 6th bill of exceptions states, that the Plaintiffs then prayed the Court to instruct the jury, that Baruso having removed to New York, in the United States, while Spain was neutral, for the purpose of carrying on trade, and having continued to reside in New York until after the capture of the Herkimer, the said Baruso could not, at the time of the voyage, be considered as a belligerent. This instruction the Court also refused to give, but did instruct the jury that if they should be of opinion that the said Baruso settled in New York before the war between Spain and Great Britain, and remained there domiciliated and carrying on trade generally until the capture of the Herkimer, he is to be considered as a neutral; but if they should be satisfied from the testimony that he went to New York for no other purpose but to carry on trade as a Spanish subject, which he could not engage in as a neutral, and that he was not engaged in any other trade than as a Spanish subject, he cannot be considered as a neutral.

The 7th bill of exceptions states, that the Court then, on the prayer of the Defendants, gave to the jury the following opinion

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.

" The Court having already given an opinion, that " Baruso was not a joint owner with the Plaintiffs and " Griswold and Baxter, in the return cargo of the Her- " kimer, do, in compliance with the opinion of the " Supreme Court, leave it to the jury to determine, whe- " ther Baruso had an interest in the return cargo which " increased the risk of the said voyage, and if the " risk was increased, that the policy was thereby viti- " ated." This opinion was given on the prayer of the Defendants to instruct the jury, that the non-commu- nication to the underwriters of papers showing Baruso to have an interest, and to be a Spanish subject, viti- ated the policy.

The 8th bill of exceptions stated, that the Defen- dants then prayed the Court to instruct the jury, that if they should be of opinion that the papers which were delivered to Giles by Baxter, or any of them, increas- ed the risk, and that if any of the papers which did so increase the risk were not necessary by the laws and usages of Spain, or the course and usage of trade be- tween the United States and Lima, and that it was not communicated to the Defendants that such papers would accompany the cargo, then the Plaintiffs were not enti- tled to recover. The Court gave the opinion.

The 9th bill of exceptions stated, that the Plaintiffs prayed an instruction to the jury, that in estimating the increase of risk on the return voyage of the Herki- mer, they were to consider it as a voyage which the Defendants were informed, in and by the letter of Church and Demmill, was carried on under a license from the Spanish government; and the question for them to decide was, whether the risk of such a voyage, carried on under such a license, was increased by any of the circumstances relied on by the Defendants to show an increase of risk in this case. This opinion the Court refused to give.

The 11th bill of exceptions stated, that the Plaintiffs produced a witness to prove the usage of the trade, who said that by the laws, regulations and usages of the trade, it was necessary that the property imported in- to, or exported from the colony, by a foreigner, should be under a Spanish license, and appear to be Spanish

property.   Whereupon the Defendants moved the Court
to instruct the jury, that this evidence is not competent
to prove the municipal laws of Spain, or the usage and
custom of trade established by their municipal laws.
The opinion of the Court was, that " no parol evidence
is admissible to the jury, or if given, can be regarded
by them, to prove the legislative edicts or acts of the
Spanish government, or to prove any usage, custom or
course of trade conformable to such edicts or acts ; but
that such evidence is admissible to prove the general
usage and course of trade that may depend on instruc-
tions to the government of Peru."

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.

The 13th bill of exceptions stated, that the Plaintiffs
produced witnesses, ignorant of the laws of Spain, to
prove their understanding of the usage of the trade ;
and the Defendants produced counter testimony on the
usage ; whereupon the Defendants moved the Court to
instruct the jury, that the testimony of the Plaintiffs, if
believed, was not competent to show the usage or course
of trade that the Herkimer, on her return voyage,
should be accompanied with papers giving the cargo the
appearance of Spanish property.   The Court refused
to give this opinion, but instructed the jury, that if they
were of opinion that the usage or course of trade from
or to the province of Peru by foreigners, was to have
a license from the king of Spain to trade, and to have
Spanish papers on board, to show or give color that
the cargo was Spanish property, the Defendants were
bound to take notice of such course of trade ; but if the
jury should be of opinion that the trade was prohibited
by the laws of Spain, the Plaintiffs must prove that the
Defendants had notice or information of such prohi-
bition.

The 20th bill of exceptions is to an opinion of the
Court, that whether the abandonment was in reasonable
time or not, is not a fact to be exclusively left to the
jury, but to be decided by them under the direction of
the Court.

The 24th bill of exceptions stated, that the Defen-
dants moved the Court to instruct the jury, that the in-
surers are not liable for any increase of risk, in conse-
quence of any acts done by the insured to avoid seizure

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.

and confiscation under the laws and regulations of the Spanish government, which instruction the Court gave.

The 25th bill of exceptions stated, that the counsel for the Plaintiffs then moved the Court to instruct the jury, that the right of the Plaintiffs would not be affected by any increase of risk produced by such acts as were stated in the preceding exception, if such acts were according to the course and usage of trade on the voyage insured. This opinion the Court refused to give.

The 28th bill of exceptions stated, that the Plaintiffs moved the Court to instruct the jury, that the increase of risk, by which alone the right of the Plaintiffs to recover in this action can be effected, is an increase (by reason of some act or omission of the Plaintiffs, or their agents) of the danger of *rightful* capture or condemnation under the law of nations. The Court refused to give this opinion.

The verdict and judgment being against the Plaintiffs they sued out their writ of error.

HARPER, *for the Plaintiffs in error.*

1. The 1st question is that upon which the Court below was divided in opinion, viz : whether the letter of Gilchrist to Webster & Co. ordering the insurance, contains a representation that no other person than Livingston, Gilchrist, Griswold and Baxter was interested in the return cargo of the Herkimer, or that all the persons interested therein were native Americans. It certainly does not contain a direct affirmation of either of those facts. It contains at most a negative pregnant; an ambiguity of which the underwriters, if they deemed it important, should have required an explanation. Nothing can amount to a representation which is not certain to a common intent; so certain as not to admit of a doubt, provided the veracity of the party be not questioned, and he be not under a mistake. There is no difference between a representation and a warranty, except that the one is contained in the policy and the other is out of it. They must both be equally certain.

STORY, J. Do you admit this question to be relevant to the cause?

HARPER: No. That is another branch of the argument, I shall contend that it was immaterial whether Baruso were a neutral or not; but that he was, *quoad hoc* neutral.

2. The 2d question arises upon the 5th bill of exceptions, which was the first taken by the Plaintiffs. It is to the refusal of the Court to instruct the jury that there was no such concealment of papers as could affect the Plaintiff's right to recover; and to the opinion which the Court gave, whereby they made the effect of the concealment depend upon the question whether the papers were *necessary* according to the usage and course of the trade. The Plaintiffs object to the opinion given.

1 Because it makes the effect of Baxter's conduct relative to the papers depend on the usage and course of the trade; whereas, independently of any such usage, that conduct could not affect the right of recovery; inasmuch as it did not amount to a concealment of papers; and as the concealment of papers cannot affect such a right.

2. Because it requires that the usage and course of the trade; in order to make this conduct of Baxter innocent, should render it *necessary* to have those papers on board, whereas if the usage and course of trade PERMITTED the having them, it was sufficient.

3. Because it extends to *all* the papers delivered by Baxter to Giles; many of which were perfectly immaterial and innocent in themselves, independently of any usage or course of trade.

The act did not amount to a concealment. It was only putting the papers from one trunk to another less liable to be searched. It must be such an act as would be likely to prevent discovery; and it must be done with intent to deceive the belligerent, and to defraud him of some belligerent right. When the prayer for an instruction is hypothetical, the facts constituting the hypothesis are to be considered as found by special verdict. If these facts had been found by a special verdict, they would not have been a finding of a concealment. But concealment of papers is not a violation of neutrality. It is no ground for condemnation, nor even

*Margin:* LININGSTON & GILCHRIST *v.* MARY'D. INS. CO.

LIVINGS-
TON &
GIL
CHRIST
v.
MARY'D.
INS. CO.
for detention.. The answer to the Russian memorial expressly disclaims *concealment* and even *destruction* of papers as a legal ground of condemnation. It is only a ground to refuse costs or damages on restitution ; or to refuse further proof, where there is *prima facie* ground of condemnation independent of the concealment—1, *Rob. append.* 5, *answer to the Russian memorial,* 2, *Rob,* 88—*the Rising Sun.* Even spoliation of papers would affect *Baxter's* property only ; and the Plaintiffs would be permitted to give further proof.

Some of the papers delivered to Giles were wholly unimportant, and unnecessary to the prosecution of the voyage in safety, and yet the opinion of the Court, (to be in favor of the Plaintiffs) required that they should be necessary according to the usage and course of the trade. Among those papers was an estimate of the value of the cargo if re-shipp d from New York to Cadiz. This certainly was not necessary by the usage of the trade. There were several other papers equally unimportant. Yet in the opinion of the Court the concealment of these papers violated the warranty of neutrality.

3. The 3d question arose on the 6th bill of exceptions which was to the opinion of the Court which made Baruso's character, as a neutral or belligerent, depend upon the kind of trade he carried on, as well as upon his domicil.

The Plaintiffs object to this opinion, 1st. Because the place of domicil acquired in time of peace is the criterion of a man's character as neutral or belligerent, and not the nature of the trade. In the case of the *Harmony,* 2, *Rob.* 266, G. W. Murray residing in France, was considered as a belligerent, while his partners *in the same adventure,* residing in the United States were considered as neutrals. 3, *Rob.* 21, *the Indian Chief.* 3, *Rob.* 37, *the Citto.*—1, *Rob.* 323, *standing interrogatories.* 12th *interrogatory as to residence of the parties.*—5, *Rob. Appendix,* order in council of the 24th of June, 1803, relating to *inhabitants* of certain colonies. 8, *T. R* 31, *Wilson v. Marryat,* 1, *Caine's cases in error,* 25, *Duguet v. Rhinelander.* The nature of the trade has nothing to do with the question. If neutral by domicil he may trade with belligerents, provi-

ded it be not in articles contraband of war. His neutrality was not inconsistent with his privilege as a Spanish subject. He does not lose his privilege by becoming a neutral American. As between him and the government of Spain, he was still a Spanish subject. But as between him and the government of Great Britain, he was, according to the principles of the British prize Courts, an American merchant.

LIVINGSTON & GIL-CHRIST v. MARR'D. INS. CO.

The Plaintiffs also object to the opinion of the Court because there was no evidence upon which the Court could ground the hypothesis, that Baruso came to this country to carry on that trade *only*. Although the fact might be that he carried on no other trade yet it does not follow that he came here for no other purpose.

4. The 4th question arises under the 7th bill of exceptions, which states that the Court (in compliance with the opinion of the Supreme Court *) left it to the jury to determine whether Baruso had an interest in the return cargo which increased the risk of the voyage; and directed the jury that if the risk was increased, the policy was thereby vacated.

The Plaintiffs object to this opinion of the Court,

1. Because it leaves it to the jury to decide a mere question of law, viz : whether the contingent interest of Baruso in the voyage, could have the effect of defeating the Plaintiffs right to recover, by increasing the risk ; instead of directing them, as ought to have been done, that such an interest was not subject to capture ; that the Plaintiffs were not bound to disclose it ; and that therefore it could not in law affect their right to recover.

2. Because it does not, as it ought to have done, make the effect of Baruso's interest on the right of recovery, depend on his national character ; it being clear, as the Plaintiffs contend, that if he was a neutral, and not a belligerent, his property was not liable to capture, and no interest which he had in the voyage could affect their right.

See Ante, vol. 6, p. 274:

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.

3. Because it does not, as it ought to have done, make the effect of this interest on the right of recovery, depend on the usage and course of the trade; it being clear as they contend, that if the usage and course of the trade authorized the use of a Spaniard's name to cover the voyage, a mere contingent interest of that Spaniard in the voyage could not, nor could any interest which he could have in it *consistently with the warranty*, affect the right of the Plaintiffs.

4. Because the Defendants, having protected themselves, by a warranty of neutrality, against the effect of any belligerent interest in the voyage, were not entitled to a disclosure of that of Baruso, even could it be considered as a belligerent interest.

The Court below misunderstood the opinion of this Court upon every point on which an opinion was given when this cause was before this Court on the former writ of error, (*Ante, vol. 6, p. 274.*)

Whether Baruso had an interest in the return cargo was a question of law dependent upon the construction of this contract.

The opinion of this Court was that if Baruso had an interest in the return cargo, the materiality of that interest to the risk of the voyage, was a fact to be decided by a jury under the direction of a Court. This Court did not decide that the question whether Baruso had such an interest, was to be left to the jury. The Court below ought to have directed the jury that Baruso had no interest. He was not to share the loss unless that loss happened by a defect in his license. He was only to share in the profits after the vessel should arrive. It was only a contingent interest in the success of the voyage, like the interest of a consignee who is to have a commission on the sales. Suppose a consignee in a neutral country should be a subject of a belligerent nation, would his contingent interest vitiate the policy? It would afford no *just* ground of interference by a belligerent. The question is not what would furnish a just pretext for rapacity, but what would be a just ground of detention under the law of nations. 1. *Caine's Ca.*

*in error*, 25, *Duguet v. Rhinelander*.  9; *East*, 282, *Ba-ker v. Blakes*.

LIVINGS-
TON &
GIL-
CHIRST.
.v.
MARY'D.
INS. CO.

The Court below ought to have told the jury that Baruso, being domiciliated in the United States, was to be considered as a neutral, and as such, his property was safe under the law of nations, whatever pretext his name might have afforded to a rapacious cruizer.

The connexion of a belligerent interest with a neutral interest, does not render void a policy on the neutral interest.

Besides the course of the trade made it necessary that the property should be in the name of Baruso, and this was known to the underwriters.

But, with submission to any opinion which this Court may have given, the interest of Baruso was wholly immaterial to this case.  The Defendants have guarded themselves by the warranty of neutrality.  If the property be neutral their mouths are stopped.  When they take a warranty, they wave all questions of this kind.  The premium was calculated upon the warranty.  When a contract is reduced to writing all antecedent negotiations are merged in the conclusive act.  The Plaintiffs were not bound to give notice of any belligerent interest.  As to every thing against which the warranty is a protection, no disclosure was necessary.—*Marshall*, 475.  If Baruso's interest did not violate the warranty it was immaterial.

5. The 5th question arose upon the 8th bill of exceptions which was taken to the opinion of the Court, "that if the jury should be of opinion that the papers "which were delivered by Giles to Baxter, or any of "them, increased the risk, and that if any of the papers "which did so increase the risk were not necessary by "the laws and usages of Spain, or the course and usage "of trade between the United States and Lima, and "that it was not communicated to the Defendants that "such papers would accompany the cargo, then the "Plaintiffs were not entitled to recover."

To this opinion the Plaintiffs object.

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.

1. Because it requires that those papers, in order to be considered as innocent, should be *necessary* by the usage and course of the trade; whereas it was sufficient if the usage *authorized* them, although it might not have rendered them necessary.

2. Because the Defendants having protected themselves by a warranty of neutrality against unneutral conduct, were not entitled to a disclosure of the fact that those papers would be on board.

The effect of the Spanish papers was neutralized by the real American documents on board, showing clearly the real state of the interest of the Plaintiffs. If the Spanish papers had stood alone they might have been a ground of detention, or perhaps of further proof; but they of themselves showed a neutral character, though not the same ownership. They showed the property to belong to Baruso, and that he was a resident of Boston. But the papers which accompanied them in the same bundle, showed the real ownership and clear neutrality of the cargo. The Spanish papers, therefore, did not prove the property to be belligerent; and if they did not falsify the warranty, they were perfectly immaterial.

6. The 6th question was upon the 9th bill of exceptions, which was taken to the refusal of the Court to instruct the jury that in estimating the risk they were to take into consideration the circumstance that it was a voyage which the Defendants were informed was carried on under a license from the Spanish government. It is clear that the connexion of Baruso with such a voyage could not increase the risk.

7. The 7th question was upon the 11th bill of exceptions, which was taken to the opinion of the Court that parol evidence was not admissible to prove any usage, custom, or course of trade. conformable to the legislative edicts or acts of the Spanish government. But that such evidence was admissible to prove the general usage or course of trade that might depend upon *instructions* to the government of Peru.

The Plaintiffs object to this opinion because it precluded them from parol proof of the usage and course

of trade, in case that usage and course should have arisen out of, or even should happen to be in conformity with the legislative acts or edicts of Spain. 'Whereas the usage and course of trade are in all cases facts capable of parol proof, and seldom susceptible of any other,

LIVINGS-<br>TON &<br>GIL-<br>CHRIST<br>v.<br>MARY'D.<br>INS. CO.

8. The 8th question arose upon the 13th bill of exceptions, which was taken to the opinion of the Court that the Defendants were bound to take notice of the usage and course of trade, but not of the *laws* of Spain prohibiting the trade.

To the latter part of this opinion the Plaintiffs object,

1. Because, whether the trade was generally prohibited by the laws of Spain, or not, was a matter wholly immaterial; and their right of recovery ought not to depend on the knowledge which the Defendants might or might not possess of an immaterial fact.

2. Because if the prohibition of this trade by the laws of Spain was legally proved, and was a material fact, the Defendants were bound to take notice of it.

3. Because there was no legal evidence given in the cause, or stated in any of the bills of exceptions, that this trade was generally prohibited by the laws of Spain; the only evidence being that it could not, according to the usage and course of the trade, be carried on to a foreign port, except under a special permission, a Spanish name, and Spanish papers. 'Therefore it ought not to have been left to the jury to find that this trade was prohibited by the laws of Spain, as a foundation for requiring the Plaintiffs to prove that the Defendants had notice of the prohibition.

9. The 9th question was on the 20th bill of exceptions, which was taken to the opinion of the Court, that the question whether the abandonment was or was not in reasonable time, was not a question of fact to be exclusively decided by the jury, but was to be decided by them under the direction of the Court. The Plaintiffs contend that under the opinion of this Court in this case upon the former writ of error *(ante, vol. 6, p. 274)*

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.

it is a mere question of fact to be found by the jury. But as some doubt arose in consequence of what was said by this Court in the case of the *Chesapeake In. Co. v. Starke*, *(ante, vol. 6, p. 268.)* this bill of exceptions was taken that the opinion of this Court may be fully understood.

MARSHALL, *Ch. J.* said he understood that the Court might instruct the jury that certain facts constitute reasonable notice; but that in a special verdict it must be stated whether the time was reasonable.

HARPER.

10. The 10th question arises upon the 24th and 25th bills of exception. In which the Court instructed the jury in substance that the insurers were not liable for any increase of risk in consequence of any acts done by the insured to avoid seizure and confiscation under the laws and regulations of the Spanish government; although such acts were according to the usage and course of the trade on the voyage insured.

The Plaintiffs object to this opinion,

1. Because it is in vague and indefinite terms; whereas it ought to have specified the acts which were to have the effect in question; to the end that they might appear to be acts of which there was evidence before the jury, and which, if proved, were capable in law of producing that effect.

2. Because the effect of those acts on the right of recovery. is not made to depend on the course and usage of the trade.

11. The 11th question was upon the 28th bill of exceptions, which was taken to the refusal of the Court to instruct the jury in substance that the only risk, the increase of which could affect the Plaintiff's right to recover, was the risk of *rightful* capture under the law of nations.

The Plaintiffs contend that what would give a mere pretext for unjust capture, was not sufficient to charge

the Plaintiffs with an increase of the risk insured against, so as to avoid the policy. Every thing was immaterial which did not increase the risk of rightful capture and condemnation; and which did not furnish at least a ground of condemnation which the belligerent has holden to be a rightful ground.

Baruso had no interest in the ship, and yet the ship as well as the cargo was condemned—no doubt on the principle that it was a trade in time of war, not permitted in time of peace. But the license *diminished* the risk because it showed that it was a trade permitted in time of peace.

PINKNEY, *Attorney General, contra.*

1. As to the division of opinion in the Court below.

It is true the letter ordering the insurance does not in direct terms deny that no other person had an interest in the cargo, but it contains a strong implication to that effect. If any transaction requires *bona fides* it is a representation for insurance. It is the act of the insured and they ought not to shelter themselves under an ambiguity. If it be calculated to mislead it is sufficient.

It is true that nothing is stated negatively. But why name others as concerned who were not to be insured, unless to inform the underwriters respecting the whole transaction with reference to the national character of all parties concerned. It is calculated to excite in the minds of the underwriters a belief that it contains information on that subject. They who undertake to convey information must take care that it do not excite an idea which they did not mean to convey.

This point, however, is not considered as of very great importance.

2. The next question is much more important. This question arises on the 5th bill of exceptions.

The Court gave, in substance, the instruction which the Plaintiffs prayed, and yet the Plaintiffs excepted be-

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.

cause it was not exactly in their own words. The Plaintiffs had, among other things, given evidence that the papers found in Giles's trunk were *necessary* 'according to the usage and course of the trade, and then prayed the Court to instruct the jury that if they believed the evidence so offered, then there was no such concealment of the said papers as could affect the right of the Plaintiffs to recover; and this was in truth the direction which the Court gave.

But the Court ought not to have given the direction as prayed. The concealment of the papers was unneutral; although the parties were justifiable in using them to protect their illegal trade. The whole transaction was unneutral: first, in concealing the papers, and secondly, in denying a knowledge of them. The belligerent had a right to see the papers. It was a clear belligerent right flowing from the right of search.

No Court of admiralty, however rapacious, has ever considered concealment of innocent papers as, *per se*, a ground of confiscation But this was not a concealment of innocent papers. It was a concealment of papers tending to prove the property to be belligerent. It increased the suspicions already excited by other circumstances. Baxter was supercargo, and his acts bind the others, although he was a partner. All the partners are affected by the fraud of any one of them. 1 *Rob.* 105, *The Welvaart.* If this unneutral conduct brought the property into suspicion it is sufficient. If it subjects the property to such detention as would authorize abandonment, the Plaintiffs were not entitled to the opinion prayed in the 5th exception. In a case where there was concealment of such papers as were calculated to induce such suspicion as would require further proof, and this concealment followed by prevarication, we could not expect a prize Court to acquit. It would at least produce detention continued by an adjournment of the case.

This concealment, connected with the other circumstances, justified the condemnation. There were documents showing the property to be in four Americans. Among the concealed papers was a copy of the royal Spanish license, authorizing a Spanish subject resident

in Boston to import goods into the United States from the Spanish colonies. The adventure appeared to be Spanish. It could only be carried on by a Spaniard. There was also concealed another paper of great effect— a power of attorney from Baruso to Baxter, the supercargo, in which Baruso says the cargo " *is laden for me* " *and on my account and risk.*" It proved the property to be in Baruso, and that he was a Spanish subject. It calls him a *Spanish merchant.* It showed his *national* character to be belligerent, although he was resident in a neutral country.

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.

It is not residence only which gives the national commercial character. The intention, the nature of the errand, the permanency of the residence, are all necessary ingredients.

The circumstances of suspicion were very strong, Baxter's receipt, &c. states him to be the *agent of Baruso.* The letters from Baruso's friends, the clearances, &c. &c. were all " *on account of the royal license,*" and stated that the cargo was to be delivered to Baruso. He was the cloak of the transaction, and he could only be a cloak by his *Spanish character.* When there are two sets of documents it is immaterial to the captors which they wished to conceal. All these circumstances created too strong a suspicion to justify an acquittal. The case might have been explained but for the unfortunate conduct of the supercargo, which induced a denial of further proof. He, who could and ought to have explained the concealment, did not, but increased the suspicions by his prevarication. There were only three alternatives before the Court—to acquit, to condemn, or to allow further proof. The suspicion was too strong to acquit—the prevarication precluded further proof. There was nothing left but to condemn.

The first and most essential of all belligerent rights is that of visitation and search. The right to see all the documents is a necessary consequence of that right, or it would be nugatory. It was the duty of the supercargo, as a neutral, to show *all* the papers. Why did he show the neutral papers only? The object of the supercargo was to defeat an acknowledged belligerent right, and he endeavored to deceive the adjudicating Court.

LIVINGS-
TON &
GIL-
CHRIST

v.

MARY'D.
INS. CO.

STORY, J. I wish you to consider whether, if the trade be *necessarily* belligerent, the concealment of these papers can be considered as material.

PINKNEY. That is, whether they can make the case worse? Perhaps not.

3. The 3d point is as to the neutral character of Baruso by reason of his residence in the United States.

Locality is something; but not every thing. So is the time of emigration.

The general principle of the law of nations is, that the belligerent character belongs to the *subject* of the hostile nation wherever found. Mere change of place does not alter the character. It is easier for a neutral to slide into the character of an enemy, than for an enemy to fall into that of a neutral. But even in such cases, that great expounder of the law of nations, sir V. Scott, examines all the circumstances of the case, time of removal, permanency of residence, motive, and nature of his business. The case of *Collett* (8 *T. R.* 31, *Wilson v. Marryat*) has no bearing upon this case. The special verdict found Collett to be a citizen of the United States, and the case depended upon the treaty of 1794.

The case of Mr. Johnson is not more to the point. His office of American consul prevented his residence in London from affecting his national character. If he had not had the *animus revertendi* before the voyage of the Indian Chief was commenced, and had not departed before the arrival of the ship, the trade would have been adjudged unlawful.

The next case is that of G. W. Murray. Sir W. Scott not only forgot to administer justice in mercy, but pushed his principles of commercial law infinitely too far. The commissioners, under the 7th article of the British treaty,* gave Murray compensation on the ground that the decision of sir W. Scott was wrong.

* Of whom Mr. Pinkney was one

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.

But, even upon the principles on which that case was decided, residence alone does not constitute national character. The time of his removal and the nature of his employment were also considered.

So also in the case of the *Citto,* 3 *Rob.* 38, the nature of Mr. Bowden's residence in Holland was examined.

The question always is, whether he has become, not a citizen or subject, but a *merchant of that country;* i. e. a general merchant. But did Baruso become a general American merchant? Was his trade American? Was it neutral? No. He carefully wrapped himself up in the folds of his license, and fenced himself round to exclude the American character.

The case of *Duguet v. Rhinelander* is not more applicable than the others. The Plaintiff was a naturalized citizen, had been long resident and was embarked in the general trade of the country.

As to the Plaintiff's 2d objection to the opinion, because there was no evidence upon which the Court could raise the hypothesis that Baruso came to this country for no other purpose than to carry on that particular trade—the fact is otherwise. There was evidence from which the jury might infer the fact supposed by the Court; and they have found it.

4. The 4th question arises upon the 7th bill of exceptions, and is whether the Court ought to have left it to the jury to decide whether Baruso had an interest in the cargo.

Perhaps it was a question of law dependent on the construction of the contract, and ought to have been decided by the Court. But the Plaintiffs cannot complain that the Court left it to the jury to decide a question of law which the Court ought to have decided against him. Baruso had an interest. He was a partner. The written contract says *" he agrees to the following* PARTNER- SHIP." It is not contended that they are bound by the word *"partnership"* if the contract does not in law amount to a partnership. But the term may explain other doubtful expressions. Livingston was to contri-

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.
bute vessel and funds—Baruso the license, and services; as far as his services were necessary to give effect to the license. Here was a joint contribution for common benefit. It was not necessary that the losses should be equally borne, nor the profits equally divided. Here was also a participation of profits, even in an equal degree, in a certain event. So there was a contribution in loss. If the expedition failed Livingston would lose his goods, and Baruso the use of his license for a certain time. The suffering, in their own estimation, would be equal. In case of loss upon the sales, Baruso was to contribute, and if the cargo should be lost by reason of a defect in the license, the whole loss would fall upon him. He is guarrantee also for the consignees in South America. He had also an interest in the specific goods. In a certain case he was to have a right to take a portion of the goods themselves. The policy was underwritten while the vessel was on her return voyage, and while he had this interest. It was not a mere contingency, but a vested interest.

It is contended that if the usage and course of the trade authorized the use of a Spanish cover, a real Spanish interest would not increase the risk. But the warranty of American property forbids a mixture of a belligerent interest; at least it would in a Court of admiralty.

5. The 5th question was upon the 8th bill of exceptions.

This opinion will not bear the construction which the Plaintiffs have put upon it. It does not mean to say that the papers to be innocent must be *necessary* according to the usage of the trade; but if it was the usage of the trade to have such papers, then they were innocent.

6. The Plaintiffs were not entitled to the instruction prayed for in the 9th bill of exceptions, because it was an instruction as to a *fact*; viz. that the Defendants had notice that the voyage was to be carried on under a royal Spanish license. Whether they had such notice depended upon the question whether they recollected the letter of Church and Demmill, and whether they knew it was the same ship and the same voyage.

7. The 7th question was upon the 11th bill of exceptions, and was whether parol evidence could be given of an usage which grew out of a law, inasmuch as the law itself was not proved by competent evidence.

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.

It was supposed that the law should be first proved before evidence could be given of the usage dependent on that law.

8. The 8th question arose on the 13th bill of exceptions, and was whether the Defendants were bound to take notice of the Spanish laws of trade.

There is no adjudged case which requires underwriters to take notice of such laws, although they are bound to know the *usage* of the trade. If there was no evidence of the law, the opinion was immaterial and could not injure the Plaintiffs.

9. The 9th question arose upon the 20th bill of exceptions, and was whether reasonable notice was a question exclusively for the jury.

The Plaintiffs had no right to except to this opinion.

Reasonableness of time is a matter of fact to be found by a jury under the direction of a Court. And the Court may direct them from certain facts, whether it be reasonable. In the same manner as, in trover, the Court may instruct the jury that a demand and refusal are evidence of a conversion.

10. The 10th question arises upon the 24th and 25th exceptions, and was whether the Defendants were liable for an increase of risk in consequence of any acts done by the Plaintiffs to avoid seizure and confiscation by the Spanish government for illicit trade—the Plaintiffs having taken that risk upon themselves.

The principal objection to this opinion seems to be that it is too abstract, and does not state the facts which were supposed to increase the risk. But there were facts enough stated in the bill of exceptions to ground the instruction upon. All the paraphernalia of the Spanish garb, were acts done to protect the cargo from

VOL. VII.     68

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.

confiscation by the Spanish government for illicit trade, and certainly increased the risk of capture by the British, which was the only risk which the Defendants took upon themselves. 1 *Marshall,* 416, *Condy's edition.* 1 *N. Y. T. R.* 549.

11. The 11th question arose upon the 28th bill of exceptions, and was whether the risk, the increase of which could affect the Plaintiff's right to recover, could be any other than the risk of rightful capture under the law of nations.

It was not necessary that the risk should be of just condemnation under the law of nations. It was sufficient if it increased the risk of condemnation upon any principle recognized by the Courts of the captor.

The Court was not bound to give an opinion unless prayed; and if the opinion prayed be not correct the Court is not bound to give any other. 1 *Marshall,* 473, *Condy's American edition,* Sterry *v.* Delaware Insurance Co.

HARPER, *in reply.*

1. Even if the letter ordering the insurance did contain the intimations supposed, yet it did not amount to a *representation;* which must always be a *positive* affirmance or denial of some fact—see the opinion of this Court in this cause *Ante, vol.* 6, p. 274, *and Marshall,* 33.

2. As to the 5th exception, it is said that the Court gave in substance, the opinion prayed; yet if the prayer and opinion were both wrong, the Plaintiffs had a right to except. But it is not in substance the same. Perhaps if taken alone it might be so considered, but when taken in connection with the refusal to give the instruction as prayed it is, or must be understood as being different.

It was not merely the delivery of the papers to Giles, but it was also the conduct of Baxter in denying the existence of the papers, &c. which was insisted upon by the Defendants as constituting the concealment. The Defendants were still at liberty to argue to the jury

that the concealment by Giles, in connexion with the conduct of B'x'er, was such a concealment. By refusing the Plaintiff's prayer and giving the instruction as they did, the inference was plain that it did amount to such a concealment.

But there is another more important objection to the opinion. The concealment, even of criminal papers, is not a ground even of detention—nor even to deny further proof. *Spoliation* alone has that effect. (*See the answer to the Prussian memorial in the case of the Silesia loan.*) If the papers are found and produced, it excites only a slight suspicion that other important papers may be concealed. But even if it did authorize a denial of further proof, yet it is only in a case where so strong a suspicion exists from other circumstances that the Court cannot acquit. But here no such suspicion was raised by the other circumstances. The concealed papers themselves proved the neutrality of the property.

The case did not need further proof. The power of attorney of Baruso was irrevocable—if not expressly, yet by implication.

There is no case which decides that *concealment* of papers is a ground to refuse further proof. There is a great difference between *concealment* and *spoliation* of papers, as to the degree of suspicion excited. When the papers are destroyed, the mind is left to conjecture and the strongest suspicion may be justified. But when the papers are found and produced, the whole extent of their criminality appears at once.

It is true that the act of an agent binds his principal—but *civiliter*, not *criminaliter*.

Spoliation is a criminal act in the eye of a Court of admiralty. Upon the whole then,

_. This was not a case which required further proof. 2. Concealment even of criminal papers is not a ground to refuse further proof if the case required it; and 3. The papers were innocent.

This trade was within the exception of the order in council of the 24th June, 1802, and therefore the proper-

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.
ty was not liable to condemnation on account of Baru-
so's being a Spanish subject, he being an *inhabitant* of
a neutral country, and so stated to be upon the face of
the papers. It was a trade from an enemy's colony to
a neutral country. The papers therefore, in the eye of
a Court of admiralty, were perfectly innocent. The
king in council has a right to relinquish part of the bel-
ligerent rights which the nation might claim according
to the law of nations. He has done so. He has said
that the property of a Spanish subject, being an inhabi-
tant of a neutral country, shall not be liable to confis-
cation.

If the papers had been destroyed, suspicion might
have been thrown upon the transaction, because their
innocence could not appear. But when found they show-
ed Baruso's interest to be as free from capture as Liv-
ingston's.

3. As to the 6th exception.

We admit that something more than mere residence
is necessary to constitute national character. We ad-
mit there must be an intent to trade. *Time* also is
a necessary ingredient. But no particular length of
time is required. The residence must be so long only
as to show his real intention. It is not necessary that
he should embark in all the trade of the country. It is
sufficient if he carry on a part of it. It is sufficient to
make it the trade of this country, if the benefits of it be-
long to this country and not to Spain. He employed
our ships, our seamen and our merchants, all of whom
were to make a profit. It was a trade between a Spa-
nish colony and the United States. Great Britain ne-
ver complained of such a commerce as this. She com-
plained only of a commerce between the colony and the
mother country. If he had come to this country with
a view to the war, and to carry on a trade belligerent
in it's nature, or not usual in time of peace, there might
be some ground for the objection. But this commerce
was neutral in it's nature. The Court meant to say
that if the trade was such that a neutral could not car-
ry it on, then, &c. There was no evidence that he
came to carry on a trade which, as a neutral, he could
not carry on. It is true it was a trade which, as *an*

*American,* he could not carry on ; but that did not make the trade belligerent. The Spanish government might have permitted an American to carry it on, and it would still have been a neutral trade.

4. As to the 7th bill of exceptions.

If the question of Baruso's interest be a question of law, then we contend that he had no such interest as could falsify the warranty.

He was not a partner. To constitute a partnership there must be an universal participation in gain and loss in all events. But in some events he was not to participate in either. In one event only was he to share the gain, and in one only was he to participate in the loss. He was not a joint owner of the cargo. In trover or replevin, he could not have proved an interest. If he had sold the cargo the vendee would have had no title. If he had given a note in the name of all, he only would have been bound. This interest was merely contingent, like that of a consignee in his commissions.

5. As to the 8th bill of exceptions.

The warranty of neutrality was a protection to the Defendants against all belligerent interests and belligerent appearances, and therefore it was not necessary to disclose the belligerent cover of the real neutral interest. It is sufficient that the property insured was strictly and really neutral.

6. As to the 9th exception.

The letter of Church and Demmill, stating that the vessel was to trade under a license, was referred to in the letter which ordered the insurance and which was laid before the Defendants. It is a principle of law that they are supposed to know what they had the means of knowing and what it was their interest to know. It was proved that the letter of Church and Demmill had been laid before them on a former day, and when they were again referred to it, they ought to have recollected its contents, or have asked for it again.

7. As to the 11th bill of exceptions.

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.

An usage cannot be against law, and yet we were prevented from proving it, because it was conformable to law. According to the opinion of the Court, we were bound to prove that the usage was contrary to law, before we could prove it by parol.

8. As to the 13th bill of exceptions.

The Defendants were as much bound to know the *laws* of the trade, as the *usages* of the trade.

10. As to the 24th and 25th bills of exceptions.

The knowledge which the Defendants had of the trade and its usage at the time of underwriting the policy, authorized the Plaintiffs to use all the means necessary to make the voyage legal.

11. As to the 28th bill of exceptions.

The case cited is, that if there be an edict under which the belligerent does condemn, although unlawfully, it ought to be disclosed.

But here was no such edict, the condemnation was not only unlawful but unauthorized.

The Court ought not wholly to reject the opinion prayed, if it be not exactly correct; because it leaves the jury to infer that no part of it is correct. They ought to go on and state what the law is.

*March 15th....* MARSHALL, *Ch. J.* after stating the case, delivered the opinion of the Court as follows:

This perplexed and intricate case, which is rendered still more so by the manner in which it has been conducted at the circuits, has been considered by the Court. Their opinion on the various points it presents will now be given.

If the question on which the Court was divided be considered literally, the answer must undoubtedly be, that the letter of the 25th of March, 1806, contains no averment that no person other than Livingston, Gilchrist,

Griswold and Baxter, were interested in the return cargo of the Herkimer, nor that all the persons interested therein were native Americans. This would be perceived from an inspection of the letter itself, and there would be no occasion for an application to the Court concerning its contents. But the real import of the question is this. Is the language of the letter such as to be equivalent to an averment that the owners named in it are the sole persons who were interested in the return cargo? If it does amount to such an averment, then it, is a representation, and if it be untrue, its materiality to the risque, must determine its influence on the policy. A false representation, though no breach of the contract, if material, avoids the policy on the ground of fraud, or because the insurer has been misled by it.

Upon reading the letter on which this insurance was made, the impression would probably be that the four persons named in it were the sole owners of the return cargo of the Herkimer. The inference may fairly be drawn from the expressions employed. Such was probably the idea of the writer at the time. The writer however might have, and probably had other motives for his allusion to other owners, than to convey the idea that there were no others. The premium might in his opinion be affected in some measure by stating the little apprehension from capture, which was entertained by others, and especially by that owner who was the supercargo. If, however, it was not supposed by Mr. Gilchrist, that the persons named in his letter were the sole owners of the cargo, or if in fact they were not the sole owners, he has expressed himself in so careless a manner as to leave his letter open to misconstruction, and, in the opinion of some of the judges, to expose his contract to hazard in consequence of it.

But that part of the Court which entertains this opinion, is also of opinion, that the letter ought not to be construed into a representation of any interest to grow out of the voyage distinct from actual ownership of the cargo. " The owners, says Mr. Gilchrist, are already insured against the dangers of the seas," &c. His application was for the owners ; and when he proceeds to state, that others were concerned, he must be understood to say that they were concerned as owners. Consequently if the letter implies an averment, that he has named all the owners.

LIVINGS-
TON &
GIL-
CHRIST

*v.*

MARY'D.
INS. CO.

it implies nothing further, and ought not to be construed into a representation, that there were no other persons interested in the safe return of the cargo.

Others are of opinion, that to constitute a representation there should be an affirmation or denial of some fact, or an allegation which would plainly lead the mind to the same conclusion. If the expressions are ambiguous, the insurer ought to ask an explanation, and not substitute his own conjectures for an alleged representation. In this opinion the majority of the Court is understood to concur. The instruction then applied for by the counsel for the Plaintiffs, on which the Circuit judges were divided, ought to have been given.

5th. A majority of the Court is also of opinion, that the instruction prayed for as stated in the 5th exception ought to have been given. If the jury believed the facts offered in evidence by the Plaintiffs, which were that by the usage of the trade to Peru from any foreign port, it was necessary for the ship to have on board, on her return voyage, the Spanish and other material papers delivered by Baxter to Giles, then there was no such concealment of said papers as can affect the right of the Plaintiff to recover in this action. In general concealment of papers amounts to a breach of warranty. But when the underwriters know, or, by the usage and course of the trade insured, ought to know, that certain papers ought to be on board for the purpose of protection in one event, which, in another, might endanger the property, they tacitly consent that the papers shall be so used as to protect the property. The use of the Spanish papers was to give a Spanish character to the property in the Spanish ports ; and, of the American papers, to prove the American character of the property to other belligerents. But to have exhibited the Spanish papers to a British cruizer and thus to induce a suspicion that the property was belligerent, would have been not less improper than to have exhibited the proofs of American property in a port of Peru, and thus to defeat the sole object for which Spanish papers were necessarily taken on board.

6th. A majority of the Court is also of opinion, that under all the evidence in the cause, Baruso, was to be

considered as an American merchant, whether he carried
on trade generally, or confined himself to a trade from
the United S`ates to the Spanish provinces. The Cir-
cuit Court therefore erred in making the neutral cha-
racter of Baruso to depend on the kind of trade in which
he was engaged, instead of its depending on residence
and trade, whether general or limited.

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.-
INS. CO.

7th. The instruction of the Circuit Court to which
the 7th exception was taken, is obviously formed on a
plain and total misconstruction of the former opinion,
of this Court. In no part of that opinion has the idea
been indicated, that the interest of Baruso was a ques-
tion solely for the consideration of the jury unaided by
the judge. It is certainly a question on which it was
proper for the judge to instruct the jury. The opinion,
given by this Court, was, that " if the jury should be of
opinion that the Spanish papers, mentioned in the case,
were material to the risk, and that it was not the regu-
lar usage of trade to take such papers on board, the
non-disclos e of the fact, that they would be on board,
would vit* te the policy ; but if the jury should be of
opinion that they were not material to the risk, or that
it was the regular usage of the trade to take such pa-
pers on board, that they would not vitiate the policy."
The instruction of the Circuit Court to the jury ought
to have conformed to this direction. Instead of doing
so, those instructions were to exclude entirely from the
consideration of the jury the regular usage of trade.
They refuse to allow any influence to a fact, to which
this Court attached much importance. It is the unani-
mous opinion of this Court, that in giving this in-
struction the Circuit Court erred.

8th. The Circuit Court seem also to have varied
from the directions formerly given by this Court, in the
opinion to which the 8th exception is taken. This
Court placed the innocence or guilt of having on board
the Spanish papers, mentioned in the case, on the regu-
lar usage of trade ; the Circuit Court has made their in-
nocence to depend on their being necessary.

The counsel for the Defendants contends, that this
is a distinction without a difference ; but it is impossi-
ble to say what difference this distinction might make

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.

with the jury. It is also the opinion of this Court that, in estimating the materiality of the papers to the risk, their effect, taken together, should be considered , not the effect of any one of them taken by itself.

9th. The opinion which the Court refused to give, to which refusal the 9th exception is taken, depends on several distinct propositions which must be separately considered.

The letter, on which this insurance was made, contains a direct reference to a previous letter written by Church and Demmill, which was laid before the company, for a description of the ship. The first question to be considered is, did this reference make it the duty of the directors to see that letter, and are they, without further proof, to be considered as having read it. The letter was addressed to, and it is to be presumed remained in the possession of, the agent who made this insurance.

It is a general rule, that a paper, which expressly refers to another paper within the power of the party, gives notice of the contents of that other paper. No reason is perceived for excepting this case from the rule. It is fairly to be presumed that, on reading the letter of Gilchrist. the board of directors required the agent of the Plaintiffs to produce the letter of Church and Demmill, unless they retained a recollection of it. In that letter they were informed that the vessel had sailed for Lima, with liberty to go to one other port in South America, and that " she had permission to trade there."

What was the amount of the information communicated by this letter?

The permission to trade was unquestionably a permission granted by the authority of the country. It was a permission from the Spanish government. But whether this permission was evidenced by a license, or by other means, was to be decided by other testimony; whether it conveyed notice to the underwriters that such a license was on board the ship, depends, in the opinion of part of the Court, on the usage of the trade. Those, who entertain this opinion, think, that as this was submitted

to the jury, the Court committed no error in refusing to say that the Defendants were to be considered as knowing that the Herkimer sailed with a Spanish license on board. In estimating the increase of risk, it was certainly the duty of the jury to consider it as a voyage known to the underwriters to be carried on for the purpose of trading to Lima, and that the Herkimer had such papers on board as were usual in such a trade, but whether the license be such a paper or not, the jury were to judge as of other facts.

A majority of the Court, however, is of a different opinion. The underwriters, having full notice that the voyage was permitted, might fairly infer that it was licensed by the Spanish government; because in no other way would it be permitted. The whole question turned upon the construction of a written document which it belonged to the Court to make.

11th & 13th. The 11th & 13th exceptions may properly be considered together, since they are taken to opinions given on the same subject, and do not essentially vary from each other. The Circuit Court appears to have supposed that the general usage and course of trade could not be given in evidence, or, if given in evinence, ought to be disregarded, if the jury should be of opinion that such usage was founded on the laws or edicts of the government of the country where the usage prevailed. That is not the opinion of this Court. The usage may be proved by parol, and the effect of the usage remains the same, whether it originated in an edict or in instructions given by the government to its officers. Any conjectures, which the jury or the witnesses may make on this subject, can be of no importance, and ought to have no influence on the case. Neither can it be more necessary to give notice of a usage founded upon statute, than of a usage founded on instructions. The Circuit Court therefore erred in directing the jury that the underwriters were not bound to take notice of the usage of trade, if they should be of opinion that the trade was prohibited by the law of Spain.

20th. The opinion of the Circuit Court to which the 20th exception was taken, appears to be entirely correct.

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.

24th & 25th. The 24th & 25th exceptions are to the same opinion somewhat varied in form, and rendered more explicit, on the application of the Plaintiffs, than it had been in the instruction given on the motion of the Defendants. It is essentially the same with that to which the 7th exception was taken, and appears to have been founded on a total misapprehension of the former opinion given by this Court. In that opinion it was expressly stated, that such papers as, conformably to the regular usage of trade, were to be taken on board a vessel, would not vitiate the policy. "The acts, done by the insured to avoid seizure and confiscation under the laws and regulations of the Spanish government," which are mentioned in the application made to the Court by the counsel for the Defendants, comprehend these papers. This question therefore was decided by this Court on the former argument of this cause, and the Court is now unanimously of opinion, that the Circuit Court erred, both in granting the prayer of the Defendants, and refusing that of the Plaintiffs.

28th. In the opinion, to which the 28th exception was taken, this Court concurs with the Circuit Court. The direction, asked by the counsel for the Plaintiffs, ought not to have been given. It is expressed in terms which, if assented to, might misguide the jury. Rightful capture according to the law of nations might be construed to mean capture for a cause which would justify condemnation according to the law of nations as construed in the United States. But capture will always be made on suspicion of what the belligerent construes to be cause of forfeiture, and capture authorizes abandonment. Such acts or omissions therefore, of the Plaintiffs, as would induce a capture and detention according to the common practice of the belligerents, are proper for the consideration of the jury in estimating the risk.

This Court is of opinion, that there is error in the proceedings of the Circuit Court in this cause, in refusing to give the opinion on which that Court was divided; and also in the opinions to which the 5th, 6th, 7th, 8th, 9th, 11th, 13th, 24th and 25th exceptions are taken. This Court doth therefore reverse and annul the judgment rendered by the Circuit Court, and doth remand the cause to the said Court that *a venire facias*

*de novo* may be awarded, and other proceedings had therein according to law.

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.

### STORY, J.

I concur in the judgment of reversal which has just been pronounced. But as in some instances I differ from the opinions expressed by the majority, and in others I concur upon grounds somewhat variant, I have ventured to express my own views at large upon the important points which have been so fully and ably argued.

The first question which presents itself is on the certificate of division. To constitute a representation, there should be an explicit affirmation or denial of a fact, or such an allegation as would irresistibly lead the mind to the same conclusion. If the expressions are ambiguous, or such as the parties might fairly use without intending to authorize a particular conclusion, the insured ought not to be bound by the conjectures, or calculations of probability, of the underwriter. The latter, if in such case he deems the facts material, ought to make further inquiries. In the letter of the 26th of March, 1806, there are no words negativing the existence of other interests than those of the Plaintiff's and Messrs. Griswold and Baxter.

The negative, if any, is to be made out by mere inference or probable conjecture, and as there is no reason to suppose that the statement was made with that intent, I am satisfied that it did not amount to a representation negativing the existence of such interests. The Court below ought therefore to have given the direction prayed for by the Plaintiffs' counsel.

But, even admitting that the letter did contain the representation contended for, I am well satisfied that it was substantially true. It is not pretended that any other person except Baruso had any interest in the cargo; and it is very clear that, whatever might be his contingent interest in the possible profits of the voyage, he had no vested interest in the cargo itself. He was not a partner, for he wanted one of the essential characteristics of partnership, a direct vested interest in the joint funds. He possessed a mere possibility which, in

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.
the successful termination of the voyage, might entitle
him to a right of action for a proportion of the profits ;
or, in a specified case of election, to take a proportion
of the property itself.   But it was not such an interest
as was liable to capture, or such as could be claimed or
condemned in a prize Court.   It was less certain than
even a *respondentia* or bottomry interest, which have
not been allowed to be asserted before the prize juris-
diction.   The commissions of a supercargo upon the
sales might, with as much propriety, be deemed a vested
interest in the cargo consigned to his care.

I pass over, for the present, the fifth exception.

The sixth exception points to the national character
of Baruso.   As Baruso emigrated from Spain to the
United States during a time of peace, no question arises
as to the ability of a belligerent subject to change his
national character *flagrante bello.*

It is clear by the law of nations that the national cha-
racter of a person, for commercial purposes, depends
upon his domicil.   But this must be carefully distin-
guished from the national character of his trade.   For
the party may be a belligerent subject and yet engaged
in neutral trade ; or he may be a neutral subject and
yet engaged in hostile trade.   Some of the cases re-
specting the colonial and coasting trade of enemies have
turned upon this distinction.

But whenever a person is *bona fide* domiciled in a
particular country, the character of the country irre-
sistibly attaches to him.   The rule has been applied
with equal impartiality in favor and against neutrals
and belligerents.   It is perfectly immaterial what is the
trade in which the party is engaged, or whether he be
engaged in any.   If he be settled *bona fide* in a country
with the intention of indefinite residence, he is, as to all
foreign countries, to be deemed a subject of that coun-
try.   Without doubt, in order to ascertain this domicil,
it is proper to take into consideration the situation, the
employment, and the character of the individual.   The
trade in which he is engaged, the family that he pos-
sesses, and the transitory or fixed character of his bu-
siness, are ingredients which may properly be weighed
in deciding on the nature of an equivocal residence or

domicil. But when once that domicil is fixed and ascertained, all other circumstances become immaterial.

The prayer of the Plaintiffs (which was refused by the Court) in effect asked that if Baruso was *bona fide* settled in New York, and had no domicil elsewhere, he was not to be considered as a belligerent. The Court in effect declared that the character of his trade, and not his mere domicil, fixed his national character. There was therefore error both in the refusal and in the direction of the Court.

The seventh exception arose from a misconception of the opinion of the Supreme Court. The Court did not mean to intimate that whether an interest increased the risk or not was a mere question of fact for the jury. On the contrary the Court considered that it was a mixt question of law and fact on which the Court were bound to direct the jury as to the law. As the Court below were of opinion that Baruso was not a *joint owner* of the cargo, (in which opinion I concur) the question ought not to have been left to the jury in the broad and unqualified terms which are used. Strictly and legally speaking, Baruso had no interest in the cargo; and therefore " his interest could not be material to the risk;" and if the point, meant to have been left to the jury, was, whether the concealment of the name or the possibility of interest of Baruso increased the risk it should have been left with proper directions as to the effect of the usage of trade and neutral character of Baruso in settling that question. If the usage of trade allowed or required such cover, or if Baruso were a neutral, I am not prepared to say that, in point of law, the risk could thereby have been increased. It would have been a mere inquiry into the possible hazards from the rapacity of belligerents, or the possible effects of one Spanish name instead of another. Men reason differently upon such speculations.

Nor am I prepared to say that it is ever necessary for the assured to declare the national character of other distinct interests engaged in the same adventure, unless called for by the underwriter. If such interests' are not warranted or represented to be neutral, the underwriter must be considered as calculating upon the

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.

LIVINGS-
TON &
GIL-
CHRIST
*v.*
MARY'D.
INS. CO.
possible existence of belligerent interests, or as waving
any inquiry.

The fifth and eighth exceptions may be considered
together as they are founded upon the legal effect of
the taking on board and the concealment of the papers,
by Baxter, from the belligerent cruizer. The prayer
of the Plaintiffs in the fifth exception was for a direc-
tion that under all the circumstances of the case there
was no such concealment as would avoid the Plaintiff's
right to recover. And if, in point of law, the Plaintiffs
were entitled to such direction, the Court erred in their
refusal, although the direction, afterwards given by the
Court might, by inference and argument, in the opinion
of this Court, be pressed to the same extent. For the
party has a right to a direct and positive instruction;
and the jury are not to be left to believe in distinctions
where none exist, or to reconcile propositions by mere
argument and inference. It would be a dangerous
practice, and tend to mislead instead of enlightening a
jury.

The opinion of the Court in effect was, that the con-
cealment of *any* papers, which were *necessary* to be on
board by the usage and course of the trade, did not af-
fect the Plaintiff's right to recover. But (in conformi-
ty with the prayer of the Defendants in the eighth ex-
ception) that if any of the papers increased the risk,
and were not necessary by the usage and course of
trade, and the fact, that such papers would accompany
the cargo, was not disclosed to the underwriters, the
Plaintiffs were not entitled to recover.

It is undoubtedly true that the warranty of neutrality
extends, not barely to the fact of the property being
neutral, but that the conduct of the voyage shall be such
as to protect and preserve its neutral character. It
must also be conceded that the acknowledged bellige-
rent right of search draws after it a right to the pro-
duction and examination of the ship's papers. And if
these be denied, and the property is thrown into jeopar-
dy thereby, there can be no reasonable doubt that such
conduct constitutes a breach of the warranty.

Concealment and even spoliation of papers, do not
ordinarily induce a condemnation of the property; but

they always afford cause of suspicion, and justify capture and detention. In many cases the penal effects extend in reality, though indirectly, to confiscation. For if the cause labor under heavy doubts, if the conduct be not perfectly fair, or the character of the parties are not fully disclosed upon the papers before the Court, the concealment or spoliation of papers is made the ground of refusing further proof to relieve the obscurity of the cause; and all the fatal consequences of a hostile taint follow on the denial.

But the question must always be whether there be a concealment of papers material to the preservation of the neutral character. It would be too much to contend that every idle and accidental, or even meditated, concealment of papers, manifestly unimportant in every view before the prize tribunal, should dissolve the obligation of the policy. And if by the usage and course of trade it be *necessary* or *allowable* to have on board spurious papers covered with a belligerent character, whatever effect it may have upon the rights of the searching cruizer, it would be difficult to sustain the position, that the concealment of such papers, which, if disclosed, would completely compromit or destroy the neutral character, would be a breach of the warranty. In such case the disclosure of the papers produces the same inflamed suspicions, the same legal right of capture and detention, the same claim for further proof, and the same right to deny it, as the concealment would. If the concealment would induce the conclusion that the interest was enemy's covered with a fictitious neutral garb, the disclosure would not in such a case less authorize the same conclusion. In such case it would depend upon the sound discretion of the Court, under all the circumstances of the case, to allow the veil to be drawn aside, and admit or deny the Claimant to assume his real character. Whenever, therefore, the underwriter has knowlege and assents to the cover of neutral property under belligerent papers, (as he does in all cases where the usage of the trade demands it) he necessarily waves his rights under the warranty, so far as the visiting cruizer may demand the disclosure of such papers. In other words, he authorizes the concealment in all cases where it is not necessary to assume the belligerent national character for the purpose of protection.

LIVINGS-<br>TON &<br>GIL-<br>CHRIST<br>v.<br>MARY'D.<br>INS. CO.

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.
_____

If this view be correct it is clear that the Court ought to have given the direction prayed for by the Plaintiffs. Sitting here under a clause in the policy which enables us to look behind the sentence of condemnation, we see that the property was really neutral; and if the jury believed the evidence, the concealment was of papers which were authorized by the course of trade for the voyage, and so far from giving a hostile character, was the only means of preventing a strong presumption of that character. If we but consider the known course of decisions in the British Courts on questions of this nature, we shall find that, independent of the question of the neutral or hostile character of the ostensible owner, the trade between the belligerent mother country and its colony affects with condemnation the property engaged in it, although such property be neutral, and there be an interposition of a neutral port in the course of the voyage. On examining the papers in this case it will be found that they point, though obscurely, to such an ultimate destination. And at all events the existence of contradictory papers, one sett American, the other Spanish, would, in a Spanish trade, afford an almost irresistible inference in a prize Court that the property was really Spanish—*Noscitur ab origine.* It would take its character from its origin.

But it is immaterial, in my view, whether a prize Court would under such circumstances acquit or condemn. When the cover of a Spanish character was allowed, it was allowed for the purposes of protection; and the disclosure of it was not required elsewhere than in the Spanish dominions. One of the risks against which the insured meant to guard himself was, in my judgment, a loss on account of the use of the Spanish character: a loss which might have been more plausibly resisted, if there had been a disclosure instead of a concealment of it.

The Court also erred in declaring (in the eighth exception) that the taking on board of any of the papers, which were not *necessary* by the usage of the trade, if the risk thereby were increased, avoided the Plaintiffs' right to recover. The effect of the whole papers should have been taken together. The evidence did not authorize the Court to consider and separate the effect of

each single paper. If one unnecessary paper might have increased the risk, if singly considered, and yet, if accompanied by the others, it would not have had that effect, certainly the existence of that paper with the others would not have destroyed the right of the Plaintiffs. Yet the opinion of the Court would have authorized the jury to draw a different conclusion.

LIVINGS-
TON &
GIL-
CHRIST
v.
MARY'D.
INS. CO.

The Court should have directed the jury that if the papers were authorized by the usage and course of the trade, the concealment of them, under the circumstances, did not vitiate the policy; and that if some were authorized and others not, yet the possession or concealment of the latter with the former did not vitiate the policy, unless the unauthorized, so connected with the authorized, papers increased the risk.

The question, presented by the 9th exception, is whether the Defendants are to be considered as having notice that the voyage insured was to be pursued under a Spanish license. The letter of the 26th March, 1806, expressly refers to the letter of 17th of February, 1806, which had been laid before the underwriters; and they must therefore be deemed conversant of all the facts therein stated. A party shall be taken to have notice of all facts of which he has the means of knowledge in his own possession, or is put directly upon inquiry by reference to documents submitted to his inspection. In the letter of the 17th February the ship is declared to have a *permission* for the voyage, which in this trade can be understood in no other sense than a *license*. The Court ought therefore to have given the direction prayed for by the Plaintiffs.

The Court erred in the opinion expressed in the 11th. exception. The course and usage of trade may in all cases be proved by parol, whether such course and usage of trade arise out of the edicts or out of the instructions of the government, and whether the trade be allowed or prohibited by such edicts or instructions.

The Court erred also in the latter part of their direction to the jury under the 13th exception. It was immaterial whether the trade was or was not prohibited by the laws of Spain. In either case the underwriters

LIVINGS-
T^N &
GIL-
CHRIST
*v.*
MARY'D,
INS. CO.

were bound to take notice of the usage and course of the trade. The public laws of a country, affecting the course of the trade with that country, are considered to be equally within the knowledge and notice of all the parties to a policy on a voyage to such country.

The 20th exception cannot be supported. The opinion of the Court was entirely correct.

The 24th and 25th exceptions ought to be considered together in order to present the opinion of the Court below with its full effect. It is clear that any acts done by the assured in the voyage according to the course and usage of the trade, although such acts may increase the risk, do not vitiate the policy. This opinion was pronounced by this Court on the former argument of this case, in reference to the Spanish papers to which the present application of the Defendants obviously pointed. The Court therefore err d in granting the prayer of the Defendants, and in refusing that of the Plaintiffs.

The last (the 28th) exception cannot be sustained. The proposition is conceived in too general terms, and might mislead the jury, 'Any acts or omissions of the insured or his agents which, according to the known edicts or decisions of the belligerents, though not according to the law of nations, would inhance the danger of capture or condemnation, might. if such acts or omissions were unreasonable, unnecessary or wanton, form a sound objection to the right of recovery. The insured can have no right to jeopardize the property by any conduct which the fair objects of the voyage, or the usage of the trade do not justify.'