CALLAGHAN and others vs. THE ATLANTIC INSURANCE COMPA-
NY OF NEW YORK.

Words amounting to a warranty of a vessel's being then at a particular port·
    or physically there, must have a place in the policy as forming part of the
    contract.
Distinction between an express warranty and a representation.
For the purpose of determining whether words amount to a warranty, the cir-
    cumstances, occasion of using, and object of them must be scrutinized.
The words in a memorandum for insurance, " On ship Nancy, J. S. master, at
    "and from the port of G. (where she now is,) &c." amount to a warranty ; and
    underwriters, in making out a policy would be entitled to insert them as
    part of the contract.
Any positive averment or allegation on the face of an instrument and making
    a part of the written contract, whether inserted in the body of it or written
    in the margin transversely or otherwise, amounts to a warranty or condition.
There may be several warranties in the same policy, founded upon separate
    and distinct facts; and it is immaterial in what part of the policy they are
    inserted.
A representation merely in a memorandum for insurance, is to be scrutinized
    according to its effect upon the contract.
A representation fairly made will not vitiate a policy, although it be in some
    degree erroneous. But if it contains the assertion of a material circumstance
    which the insured makes in an unqualified manner, without knowledge of its
    truth or falsehood, the same will vitiate the policy in case it turns out to be
    false.

July 27.
1831.

Policy.
Warranty.
Representa-
tion.

THIS cause came before the court upon bill and answer.

The bill stated, that John Coulter of Philadelphia, being the
owner of the ship Nancy, shipped a cargo on board of her at
that place, amounting, at the invoice price, to $51,432 33 ; and·
consigned the same to the master, in order to be sold for the
account of him, the said Coulter ; That the said ship Nancy,
James Selby, master, sailed, with her cargo on board, from
Philadelphia on or about the twenty-fifth day of July 1824 ;
and was bound on a voyage to Gibraltar and a market ; That

she arrived at Gibraltar in safety on or about the sixth day of September then next following; That on or about the twelfth day of November in the same year, (1824) and by order of the said John Coulter, an application in writing for insurance on the profits of the adventure was made to the defendants in the following words:

"On ship Nancy, James Selby, master, at and from the port "of Gibraltar (*where she now is*) to a port ·in the Mediterra- "nean, not higher than Marseilles, at and from thence to Son- "sonate in the Province of Guatimala, Pacific Ocean; with "liberty to use Guayaquil: property warranted American, to "be proved in Philadelphia only. Fifteen thousand dollars on "her profits. Policy to be valued at twenty thousand dollars."

The bill went on to state, that the defendants agreed to in- sure $7,500 at a premium of six per cent; and that their assis- tant-president, Walter R. Jones, wrote a memorandum upon the said written application, containing the sum agreed to be insured and the rate of premium—and made it binding between them and the said Coulter by writing the word "binding," or the words "made binding"—and required the agent of the said Coulter to sign the same, which he did; That it is a practice, where the premium of insurance exceeds $50, to take approved endorsed note or notes: *That at the time of the agreement, the defendants were informed that the insurance was for Mr. John Coulter, of Philadelphia, who would send his notes for the pre- mium; and that no objection was made. The complainants al- leged, that the agreement was received by the defendants; and Coulter informed thereof on the thirteenth day of the said No- vember; That after the arrival of the Nancy at Gibraltar, and before any of her cargo was discharged, to wit, on the nineteenth day of September, in the same year, (1824) the ship accidentally took fire and the cargo was entirely destroyed, the voyage broken ·up and the profits were wholly lost; That the first intelligence of loss was received by Coulter, on the fifteenth day of Novem- ber, 1824: after the making of the said agreement for insurance; That on the twenty-second day of the said month, he, Coulter, gave notice of the loss to the Company; and at the same time*

9·

*exhibited his preliminary proof and abandoned his interest to* *them.* The bill went on to aver, that by the usual terms of policies effected with the defendants, they were liable, thirty days thereafter, to pay the amount insured, after a deduction of the unpaid premium; That on the fourteenth day of January, 1825, the said John Coulter assigned to the two other complainants all his real and personal estate, for the benefit of his creditors, whereby the said Charles Callaghan and Stephen Russell obtained a vested interest in Coulter's rights under the said policy; and that they had demanded a settlement with the defendants and applied to them for a payment of the loss. The bill also charged, that it was the uniform practice of the defendants and all other insurance offices in New York to make such agreements or memorandums as aforesaid; and that they were of like force as the policy, in case of a loss before its delivery; That as the news of the loss occurred immediately after the agreement, and as the defendants had, on that account, become liable, therefore it was not incumbent on Coulter to forward his notes—the terms of policies being that the premium-notes, if unpaid, should be deducted from the amount of loss. Also, that the amount of premium was afterwards tendered to the defendants and payment of the loss or delivery of a policy demanded: but both were refused. The complainants prayed "that the said Atlantic Insurance Com- "pany of New York, may produce and set forth the said me- "morandum or agreement; and that they may be decreed "either to pay to your orators the amount so agreed to be "insured on the said profits of the said goods and merchandize "shipped on board the ship Nancy by the said John Coulter "as aforesaid: or else, to execute and deliver to your orators a "policy of insurance on the said policy, to bear date the day "of the making of the said agreement for the said sum of "seven thousand five hundred dollars, and otherwise in such "form as this honorable court shall in that behalf direct, accor- "ding to the true intent and meaning of the said agreement, to "be in all respects equally available to your orators as if it had "been duly executed and delivered to the said John Coulter on

" the day of the making of the said agreement; and that your " orators may have such further and other relief, &c."

The answer of the defendants admitted the leading facts connected with the shipping of the goods at Philadelphia; the sailing of the vessel; the application for insurance; the written memorandum connected therewith; and that it was in their possession. It went on to say, that at the period of the application it was generally understood, cargoes, the produce of old Spain, were refused admittance into the South American ports which had been colonies of Spain; and that valuable cargoes of a doubtful origin, which would pay large profits in such ports of South America, could be laden at Gibraltar—the introduction of which was sometimes facilitated by a clearance from a French port; That upon the beforementioned application being made, the voyage which was contemplated appeared and was supposed to be of this nature : *That in cases of insurance upon profits, the invariable custom of the Companies in New York in filling up the policies was known to make the same attach on the profits from and immediately following the loading at the port where the risk commenced; and that if a policy had been made in this case, it would have been made to attach to the profits of goods laden at Gibraltar or Marseilles and not to any goods laden prior to the vessel's arriving at Gibraltar;* That at the time of the aforesaid application, the defendants were ignorant of any cargo being on board prior to the ship's arrival at Gibraltar—for no explanation was given—and if the explanation had been so given as to amount to an understanding that the proposed insurance was to cover the profits of any cargo shipped prior to the Nancy's arrival, it would have been rejected; *That, inasmuch as the application contained a warranty of safety at Gibraltar, and because the defendants believed the insurance could only attach on goods laden there and at Marseilles, if she went there, they agreed to insure $7,500 on goods laden on board the said vessel at Gibraltar at a premium of 6 per cent.; That the said Walter R. Jones, (assistant-president) wrote a memorandum upon the said written application; and that J.*

*Moses, the agent of Coulter, subscribed the same.*   The memo-
           randum was as follows :

                 " Binding *a'c* of John Coulter, of Philadelphia,
             " for $7,500—6 pr ct.

                     6
                    ———                         " 12th Nov. 1824."
                 450
                         " $451 25.

                                                 " J. Moses."


        The defendants denied any agreement, by the said memo-
    randum, to insure any sum upon the profits of the goods men-
    tioned in the bill as having been laden at Philadelphia.
    They admitted it was the usual (but not, as they believed,
    the invariable) practice amongst the Insurance Companies in
    the city of New York to take notes for the premium in cases
    where it exceeded $50.   They also, generally, admitted the
    fire and loss; but denied that the voyage or risk intended to be
    insured had commenced: for the outward cargo had not been
    discharged, nor any cargo taken on board at Gibraltar.   The
    defendants insisted, *that the application contained a warranty of
    the ship's being then in safety at Gibraltar and in a state capa-
    ble of performing the voyage which had been mentioned; and
    they also insisted, that in making a policy, they had a right (and
    would still have a right in case a policy was decreed) to insert a
    warranty of the vessel's being in safety at Gibraltar on the day
    of the application:* and therefore, and for other reasons, and
    because the destruction of the vessel took place before any
    goods were thus laden on board, as well as before the date of
    the written application, the agreement was wholly void and in-
    operative and any policy under it would be nugatory.   They
    admitted it was customary on applications, to make a memo-
    randum embracing the heads of the agreement to be inserted in
    the printed policy; and that the special terms contained therein
    would be inserted in such policy; that such memorandum
    would be considered as binding on the parties; and that the

insurers were generally bound to give a policy filled up according to the terms so settled, provided the premium was paid or secured; That no offer to pay the premium or to secure the same was made until the second day of March, 1825; and they submitted that such delay was a just reason for refusing a policy. The defendants also submitted, they were not liable for the loss nor bound to give a policy: but if the court thought they were bound to give it, then they insisted it should be filled up as of the time when the written application was made and should have within it such warranty as before stated. And they were advised, that if a policy should be made conformable with the application and memorandum, then they had a good defence at law. And they insisted, it was a matter purely cognizable at law and not the subject of jurisdiction of this court.

Mr. *D. B. Ogden*, on the part of the complainants. As no policy appears to have been executed, we found it necessary to come into this court. We could not have proceeded at law, without a policy. And we could not get a policy, save by the intervention of equity. Therefore, there is jurisdiction.

The first point we make is this: If the court shall be of opinion the defendants ought to have executed the policy when required to do so by the agent or attorney of the complainants, then it is competent for the court to decree the payment of the loss by the defendants to the complainants. This will not be done by directing an issue at law; but by ordering a reference to a master: *Perkins* v. *The Washington Insurance Company*, 6 *J. C. R.* 485; S. C. on appeal, 4 *Cow.* 645.

Secondly: The statement in the application for the insurance, that the ship *now is* at Gibraltar, in the manner in which it is written, amounts to nothing more than an opinion or probable expectation that she was there at the time or to a declaration of her being there when last heard from; and, in either case, if made in good faith, it does not amount to such a false representation as would have avoided the policy. The words in the memorandum, "*where she now is*" cause the great point in controversy.

1831.

CALLAGHAN
*v.*
ATLANTIC
INS. CO.

CALLAGHAN
v.
ATLANTIC
INS. CO.

We contend, the statement we made was a probable one, that the vessel was probably there, or, in all probability at Gibraltar. At any rate, this is not such a statement as will vitiate the insurance. It was impossible the owner could absolutely know it as a fact. It was enough for him to state his belief of her being at Gibraltar. If there could be reasonable belief of this or even such a statement as left it without a fair doubt of the contrary, then we are entitled to the interference of this court. In the case of *Hubbard* v. *Glover*, 3 *Camp.* 312, there was an express declaration " that the ship was to sail in a few " days ;" and yet the court said, the owner of the goods could speak of the sailing of the vessel only from probable expectation and if such representation was made *bona fide* it would not conclude him.

The declaration there, is, in effect, not different to the one here. This case, if it stood alone, would be conclusive. The case of *Bowden* v. *Vaughan*, 10 *East*, 415, shows a representation as to the time of a ship's sailing, made by the owner of goods on board, must, from the nature of the thing, be considered only as a probable expectation, he having no controul over the event.

From *Livingston* v. *Maryland Ins. Co.* 7 *Cranch*, 535, it is fair to suppose, that the underwriters ought to have asked for explanation, if there was any uncertainty.

Our representation was in good faith and sufficient: *Livingston* v. *Delafield*, 1 *J. R.* 522. If a policy can be decreed, it must be one which will conform to the application. It excludes all warranties which are not in the memorandum. We do not warrant the vessel's being at Gibraltar ; but we do warrant her being American property. We went as far as we could in our statement ; and if the defendants had required a warranty as to the vessel's being at Gibraltar, they should have put one upon the memorandum. This case must stand upon representations.

We next contend, that if the application is to be considered as an application for insurance upon profits of the cargo, it is wholly immaterial when the cargo was laden or taken on board.

It is insisted upon by the answer, that this was an application

relative to a cargo which was to be taken on board at Gibraltar. Our answer to this is, the nature of the policy is to appear from the circumstances and is not to be made out by argumentative matter in the pleadings. The very fact of her extended voyage is a proof of its being an insurance upon the general commercial enterprise.

The last point we make is this: The word *"binding"* being written upon the application and the rate of premium being fixed by the officers of the company, the latter are as much bound as if the policy had been actually filled up and delivered.

Mr. *W. Slosson*, for the defendants. 1st. A policy ought not to be decreed, inasmuch as, according to the complainants' own showing, it would be inoperative and void. The words " where she now is," in the written application, are an express warranty that the vessel was at the date thereof (12th of November, 1824) at Gibraltar; when, in fact, she had been, with her whole outward cargo, totally destroyed and lost by fire on the nineteenth day of September preceding. A warranty is a part of this contract; and every express warranty is a condition precedent. A breach of the warranty avoids the policy, even though immaterial: 3 *Kent's Com.* 235. The most usual express warranties are, that the ship was safe at such a time, or would sail by such a day, or would sail with convoy: *Ib.* 236. A warranty is an express agreement that the thing stated is true or that the act stipulated shall or shall not be done; and the only question is, as to the fact of a warranty. An express warranty is always a part of the contract, but may be made part of it by reference. Formal words are not necessary; for any statement of a fact in a policy is a warranty. In order to support these positions I refer to *Phillips on Insurance*, (an able work) *p.* 124, 125, 126, 127, and cases there cited. There can, then, be no doubt that this expression inserted in the policy would be a warranty. If the policy was filled up it would be inserted. The general form of a policy is modified to suit the special stipulations, and which is done by inserting them in it. The only evidence of the contract is the memorandum. Every part of it goes to make up the entire contract;

1831.

CALLAGHAN
v.
ATLANTIC
INS. CO.

and no portion can be rejected. In signing a formal contract the party may require every part to be inserted.

2. But if the words are considered only as a representation, being material to the risk, they are equally conclusive against the complainants' right to recover. This position is tenable on two grounds: 1st. If the representation is untrue; and 2d. If material to the risk: *Phill.* 83. The materiality of it cannot be doubted; and whether made by mistake, design, or negligence, the effect is the same and it avoids the policy: 3 *Kent's Com.* 238; *Phillips*, 80, and cases there. A representation once made is to be considered as binding: *Edwards* v. *Footner*, 1 *Camp.* 530. In *Kemble* v. *Bowne*, 1 *Caines*, 75, the court said, " when it is stated she was at Guadaloupe on a certain " day, it must mean that she was there in safety and that no " preceding accident was to be made good by the insurers."

We contend, in the third place, that the policy, if executed according to the settled form, would only attach upon the profits of goods laden at Gibraltar from the time of the loading thereof on board; and as the outward cargo was not discharged at the time of the loss and no goods laden there previous to the loss, the risk never did or could commence; *Murray* v. *Columbian Insurance Company*, 4 *J. R.* 443, and cases in *Phill.* p. 166, 167; 3 *Kent's Com.* 256.

Our fourth point is: the contract was not obligatory until the premium was paid or tendered; and as the plaintiff waited four months, from November until March, before he tendered the premium, it was a relinquishment of any claim under the imperfect contract. And again, a court of law only has jurisdiction to decide a loss: *Carter* v. *United Insurance Company*, 1 *J. C. R.* 463; *Graves* v. *Boston Marine Insurance Co.* 2 *Cranch*, 442—444.

As a fifth point, we say, the application was not fair, there being no disclosure that a cargo had been taken from Philadelphia or of the nature of it; and the answer states, that if such disclosure had been made, the application would have been rejected unhesitatingly. The application is the written contract, and it must be adhered to: 2 *Cranch*, 419; *Lyman* v. *United Insurance Company*, 2 *J. C. R.* 630.

The sixth point:—at any rate, the court can only decree a policy to be executed according to the contract as stated in the answer containing a warranty that the vessel, at the date of the application, was at Gibraltar, and commencing the risk from the time of the loading of the goods at that place.   Every material part of the written application is to be engrafted in the policy: *Phillips*, 165, 166, 167; 3 *Kent's Com.* 256–7.   A contract cannot rest partly in writing and partly in parol: *Parkhurst* v. *Van Cortlandt*, 1 *J. C. R.* 281—283.

1831.

CALLAGHAN
*v.*
ATLANTIC
INS. CO.

Mr. *D. B. Ogden*, in reply.

The insured never did warrant the vessel's being at Gibraltar.   He only warranted her being an American ship.   The words "where she now is," are in a parenthesis, and only show belief.   Our statement amounts to a representation only and not to a warranty; and it was made in good faith   There is one warranty here and only one: namely, that the property was American.   It is not to be supposed, that any other express warranty was intended.   A policy like what we require will not be nugatory.   We say the insurance was upon the cargo shipped at Philadelphia, which connected itself with the touching at and going from Gibraltar, and with the voyage.   There is nothing in the agreement which confines cargoes to places. It matters not as to the particular ports; we insure upon the profits.   The underwriters take the risk "lost or not lost."

THE VICE-CHANCELLOR.   Upon the facts in this case it will be perceived, that the dispute is not whether there was a contract of insurance entered into between the owner and underwriters, (for it is conceded there is enough to constitute a valid and binding contract) but, what are the terms of it; so that, if they were to be embodied in the form of a policy of insurance, what ought the policy to contain?

The great point in determining this question is, the force and operation of a few simple words contained within a parenthesis in the application for insurance; which states the ship then to be at the port of Gibraltar.   If these words amount to a

*September 5.*

warranty of the vessel's being then in safety at Gibraltar or physically existing there, they must necessarily have a place in the policy, as forming a part of the contract. But if they are merely words of representation, they do not enter into the contract or form any part of it and are to be considered only as inducement to the contract; and their influence upon it will then depend upon the materiality of the fact which they represent, should it prove to be untrue, and upon the good faith in which such representation was made.

The distinction in the law of insurance, between an express warranty and a representation, is generally well understood. The former is the affirmance of some fact always inserted in a policy and forming a condition which must be strictly complied with by the assured; while the latter is a statement of some collateral circumstances not embodied in the policy, although made before the contract is completed. In order to determine whether the words in question amount to a warranty, and were so intended, (for, as in every other case, they must be construed according to the intent of the parties, to be gathered from the whole instrument,) we must look at all the circumstances, the occasion of using the words, and the object of them.

The owner had sent his ship with a cargo to Gibraltar and from thence she was to proceed on a trading voyage to the Pacific—first going up the straits, not further than Marseilles, for the purpose of obtaining a change of cargo or for some other object necessary to the success of the voyage—and from the result of which he anticipated large profits. Under these circumstances he applied for insurance, not upon the vessel or any particular cargo which she had or might take on board or earnings under the denomination of freight, but upon the profits which he expected would result to him from the goods and merchandize which might be taken on board and be sold, bartered, or disposed of in the course of the intended voyage. So far, therefore, as the insurance was concerned, it was a voyage to commence at Gibraltar; it was at that port the policy was to attach; and there the risk which the defendants agreed to assume was to begin. It was unnecessary, in showing the

commencement of the voyage, to say more than that the in-
surance was to be " at and from the port of Gibraltar :" but if
the policy contained the usual words " lost or not lost," the risk
would extend to a time previous to the date of the policy, and
the underwriter would be rendered liable for a loss previously
accrued.   The consequence to an underwriter, from the use of
these general words in a policy, may be a reason for enhancing
the premium or perhaps for his declining the risk ; and, there-
fore, in order to induce him to underwrite a policy at a less
premium, the insured might be willing to exempt the under-
writer from the chance of any antecedent loss.   Hence, in a
variety of cases, words amounting to a warranty of the vessel's
safety on a particular day, or at a certain place, or that she
would sail on a day mentioned, have been introduced into poli-
cies for the purpose of obtaining the insurance upon more fa-
vorable terms, by narrowing the risk and restricting the liability
of the underwriter: *Reade* v. *Commercial Ins. Co.* 3 *J. R.* 360.;
*Dougl.* 12. *n.* (4.) ; *Hughes,* 307, 308 ; 3 *Kent's Com.* 236.   And
hence, in the present case, the object of inserting the words
" where she now is," may have been to limit the operation of
the contract to a prospective loss ·and thereby induce the de-
fendants to assume the risk at a less rate of premium than they
otherwise would perhaps have charged.

But whatever was the object, we find these words inserted ;
and they amount to an averment of the vessel's being at Gib-
raltar on the 12th of November.   I think the defendants were'
entitled, in making out the policy, to insert these words as a
part of the contract.   There can be no doubt they would have
amounted to a warranty in case they had been inserted.
*Hughes,* in his excellent treatise on the law of Insurance p. 307,
lays it down as a settled rule, that any " positive averment or
" allegation on the face of the instrument, and making a part
" of the written contract, whether inserted in the body of it,
" or written in the margin transversely or otherwise, amounts
" to a warranty or condition."   He is fully supported in this
position by authority ; I must, therefore, consider it as amount-
ing to a warranty.

It is strongly urged against this conclusion, that, as there is

one warranty in terms contained in the application—namely, " property warranted American, to be proved in Philadelphia " only" therefore, it is not to be supposed any other express warranty was intended. This argument is not well founded. founded upon separate and distinct facts; and it is immaterial in There certainly may be several warranties in the same policy, what part of the policy they are inserted; one may be in the body of the policy, and another in the margin by way of memorandum merely; and although the one or the other may not be in the formal words of a warranty, still, if the words contain a direct or even an incidental allegation of a fact relating to the risk, they will be considered as amounting to a warranty: *Phillips on Insurance*, 25. I can, therefore, see no reason for saying, because one formal technical warranty is expressed in the writing, constituting the basis of the agreement, that the other statement contained in it may not also be considered a warranty. The maxim, " *expressio unius, est* " *exclusio alterus*" can have no application to such a case.

But, suppose I am wrong in my conclusions, and that the words in dispute are not to be taken as a warranty, but are to be looked upon as a representation merely:—The question then arises as to their effect upon the contract, although not forming a part of it? From the view which I have already taken of the subject, it is unnecessary for me to undertake the settlement of this question. Yet, as it has been discussed by the counsel, I am unwilling to pass it by without a brief examination. It must be admitted that the words used by the owner, in his application, convey a positive and unequivocal assertion of the ship's being then at Gibraltar, There is no qualification of the terms to leave the mind in doubt or uncertainty on the subject of the vessel's safety. It is true he could not have known the fact of the vessel's safety: and yet from the unqualified manner in which it is stated, the defendants had a right to repose upon it as a truth. It could make no difference to them whether he knew it to be true or not. He states it to be so, and thereby takes upon himself exclusively the chance of it, being otherwise. If he wished to throw a portion of that chance upon the defendants, he should have qualified

his expression, by saying, "the ship was at Gibraltar by the last " advices;" or "she arrived there on the 6th day of September, " and intended to remain until that time;" and even if he had said "where the ship now is, according to the last advices," it would have been sufficient to have put the risk of the vessel's safety upon the defendants, provided the representation was made in good faith—the owner being ignorant of any thing to the contrary. The principle in the cases before Lord Ellenborough, in 3 *Campbell*, 312, and 10 *East*, 415, (strongly relied upon by the complainant's counsel) is in accordance with this view. In those cases it will be seen, the representations related to mere probabilities or expectations as to the time of the vessel's sailing, which the parties could not know with certainty, having no control over the event; and they were held by the learned judge not to vitiate the policies, provided the representations were made in good faith—which point he submitted to the jury. While, therefore, on the one hand, a representation fairly made will not vitiate a policy, although it be in some degree erroneous, yet, on the other, if the representation contain the assertion of a material circumstance which the insured makes in an unqualified manner, without knowing whether it be true or not, it will vitiate the policy, if it turns out to be untrue. Thus, "a misrepresentation," says *Hughes*, *p.* 347, "by the insured, or his agent, of a material fact, will " vitiate a policy, whether the party asserts a fact which he " knows to be false or positively makes an assertion which he " does not know to be true;" and he refers to the case of *Macdowal* v. *Fraser*, *Doug.* 260, which fully supports his position. So C. J. Marshall, in *Livingston and Gilchrist* v. *The Maryland Insurance Company*, 7 *Cranch*, 535, says, "a false " representation, though no breach of the contract, if material, " avoids the policy on the ground of fraud or because the in- " surer has been misled by it." It appears to me these principles apply directly to the present case, even considering it one of representation and not of warranty. What then would be the result, if the complainants had a policy made out according to their own interpretation of the contract? The representation of the vessel's being at Gibraltar at the date of the policy would

1831.

CALLAGHAN
*v.*
ATLANTIC
INS. CO.

be falsified by the fact of her previous destruction; and, being deemed material, for the reasons before mentioned, it would be impossible for the insured to sustain an action at law for the recovery of the loss.

Again : if this court should decree the complainants a policy, containing what I hold to be a warranty in regard to the existence or safety of the ship at the time of the contract, it would still more decidedly be unavailing to them.

There were other questions raised and discussed upon the hearing, in relation to the nature of an insurance upon profits and the commencement of the risk, by the lading of a cargo at Gibraltar, which it is contended was necessary, before any policy upon profits could attach. It is entirely unnecessary to examine that branch of the case. The view I have taken of it upon the other grounds, are conclusive, in my judgment, against the complainants' right to an indemnity from the defendants on account of the loss. I might decree to them the delivery of a policy, but it would be unavailing for any beneficial purpose, and I shall, on that account, refuse it.

The bill must be dismissed; but as the complainants have brought the suit in a representative capacity, as assignees, for the general benefit of creditors under a deed of assignment of the whole of an insolvent's estate, I shall excuse them from the payment of costs.